

Priority ✓
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLARE MILNE, et al., | CV 02-08508 FMC (PLAx) |
|               Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS;** |
| vs. | |
| Stephen Slesinger, Inc., | **ORDER DENYING PLAINTIFF MILNE'S MOTION FOR SUMMARY JUDGMENT;** |
|               Defendant. | **ORDER DISMISSING DEFENDANT'S COUNTERCLAIMS AS MOOT;** |
| | **ORDER DENYING PLAINTIFF DISNEY'S MOTION TO DISMISS COUNTERCLAIMS AS MOOT.** |

This matter is before the Court on a number of motions: Defendant's Motion for Judgment on the Pleadings or alternatively, for Summary Judgment (docket #11); Plaintiff Disney's Motion to Dismiss Counterclaims or alternatively, for a More Definite Statement (docket #37); and Plaintiff Milne's Motion for Summary Judgment (#55). Oral argument was heard on

77

1  May 5, 2003, at which time the parties were in possession of the Court's

2  tentative decision.  Following argument, the matter was taken under

3  submission.  The Court now grants defendant's Motion for Judgment on the

4  Pleadings as it relates to the termination notice served by Clare Milne.

5

6  ## I. Introduction

7      This case involves a dispute over the rights to certain works by author

8  A.A. Milne ("the author"), who, in his 1920s classic children's books, created

9  characters that have, in the seventy-odd years since their creation, become

10 cultural icons.[1]  Specifically, at issue in this action are rights to *When We*

11 *Were Very Young* (copyrighted 11/12/1924), *Winnie-the-Pooh* (copyrighted

12 10/21/1926), *Now We Are Six* (copyrighted 10/14/1927), and *The House at*

13 *Pooh Corner* (copyrighted 10/15/1928) (collectively referred to as "the

14 works").

15     In resolving this issue, the Court must consider the evolution of

16 federal copyright law, which has changed over the last century with the

17 passage of copyright acts in 1909, 1976, and 1998.  The Court must also

18 consider the various agreements entered into by the parties to this action and

19 others, including the author himself, his son Christopher Robin Milne, his

20 granddaughter Plaintiff Clare Milne, Stephen Slesinger, Defendant Stephen

21 Slesinger, Inc. ("SSI"), and Plaintiff Disney Enterprises (and its predecessor,

22 Walt Disney Productions) (generically referred to as "Disney").

23     The claims and counterclaims seek only declaratory relief.  Plaintiffs

24 _____

25     [1] The characters are so recognizable they barely need introduction.  Nevertheless, they
26 include the boy Christopher Robin, and his stuffed bear, Winnie-the-Pooh, as well as their
   friends Piglet, Tigger, Eeyore, Owl, Rabbit, Kanga and Roo.  An April 3, 2003, search of
27 "Winnie-the-Pooh" on <<amazon.com>> yielded the following results:  483 items in the
   "books" category, 5 baby items, 3 DVDs, 38 toys and games, 50 videos, and a number of items
28 in the categories of music, computer and video games, magazines, electronics, and apparel.

1   seek a declaration that a copyright termination notice served by Clare Milne
2   ("Milne") is valid, and that rights to the works will revert to Milne on
3   November 5, 2004.  Specifically, Plaintiffs seek a declaration that Milne
4   possesses 100% of the termination interests in the works, that no person has
5   previously exercised the termination rights, that the termination date falls
6   within a five-year period beginning at end of 75 years from the date on which
7   the copyright was originally secured, and that therefore the termination
8   notices are valid.  Plaintiffs seek a similar declaration with respect to a
9   termination notice served by Harriet Jessie Minette Hunt, granddaughter of
10  Ernest H. Shepard,[2] who illustrated or "decorated" the works at issue in this
11  action.  Plaintiffs also seek a declaration that upon the termination effective
12  date, they are no longer required to pay royalties to SSI under a 1983
13  agreement among the parties.

14        SSI has filed two counterclaims.  In its first claim, SSI seeks a
15  declaration that an agreement between Disney and Milne regarding Milne's
16  future reversionary rights is void *ab initio* under federal copyright law.  In its
17  second counterclaim, SSI seeks a declaration that it is still entitled to
18  royalties under the 1983 agreement even if the rights revert to Milne.

19        Ultimately, the Court determines that SSI is entitled to judgment as a
20  matter of law as to both claims, and that SSI's counterclaims are moot.

21
22                          **II. Factual Background**
23  **A.      The Parties' Agreements**
24          **1.      The 1930 Grant**
25        In January 1930, the author Milne entered into an agreement with
26  Stephen Slesinger regarding certain uses of the works.  (*See* 02/10/03 Harr

27  _____

28        [2] Throughout this Order, the Court refers to Shepard as "the illustrator."

Decl., Exh. A).  In exchange for royalties (and an advance of $1000 against future royalties), Slesinger was granted certain rights[3] "for and during the respective periods of copyright and of any renewal thereof to be had under the Copyright Act . . ."  (The "1930 Grant").  Slesinger incorporated Stephen Slesinger, Inc. ("SSI") in March 1930, and appears to have transferred the rights to SSI as contemplated by the 1930 grant.[4]

### 2.     The 1961 Agreements

In 1961, SSI entered into an agreement with Walt Disney Productions regarding rights to the works ("1961 SSI Agreement").  (*See* 02/10/2003 Harr Decl., Exh. D).  SSI assigned Disney the rights, and Disney agreed to pay royalties to SSI.

Around the same time Disney also entered into a similar agreement with the author's widow and a trust that held rights to the works ("1961 Milne Trust Agreement").  Under this agreement,  Disney was granted motion picture rights, foreign merchandising rights, and other exclusive rights in exchange for royalties.

### 3.     The 1983 Agreements

In 1983, the parties entered into another agreement regarding the rights to the works ("the 1983 SSI Agreement").  (*See* Harr Decl., Exh. E).

---

[3] The 1930 Grant relates to merchandising rights.  The Grant was later amended, as evidenced by a 1932 letter from SSI to the author. (*See* 02/10/2003 Harr Decl., Exh. B).  SSI was granted other rights, including radio and television rights.  These radio and television rights, as well as motion picture rights, were returned to the author's estate for a short period of time in 1957. (*See* 02/10/2003 Harr Decl., Exh. C).

[4] Plaintiffs point out that there is no evidence the rights were transferred to SSI.  However, the later agreements regarding rights to the works were all executed on behalf of SSI; therefore, it is reasonable to assume such a transfer took place.

1   Although Disney characterizes this agreement as one that merely adjusted

2   the royalties to be paid to the parties, an examination of this agreement

3   reveals it goes far beyond the narrow scope advanced by Disney.

4       The 1983 SSI Agreement first acknowledged the 1930 Grant, as

5   amended, and the 1961 assignment of rights to Disney.  Next, the 1983 SSI

6   Agreement acknowledged that ownership of the copyrights and the benefits

7   of the 1930 Grant had been transferred to the Pooh Properties Trustees.[5]

8   The 1983 SSI Agreement then recognized that there were "disputes which

9   [had] existed between them" and declared that they were resolved to "clarify

10  certain aspect of their contractual arrangements and to settle revised

11  agreements."  The Agreement recognized that, as the author's heir,

12  Christopher Robin Milne could have a right of termination under § 304(c) of

13  the 1976 Copyright Act (17 U.S.C. § 304(c)).  By executing the Agreement,

14  however, Christopher Robin Milne agreed not to exercise that right.  The

15  parties then indicated their desire to revoke the 1930 Grant and the 1961

16  Agreements in favor of a new Agreement that would benefit all parties.

17      The Agreement then revoked the 1930 Grant:  "The agreement dated 6

18  January 1930 between A.A. Milne and [SSI]'s predecessor, and any

19  amendments thereto . . . are hereby revoked."  The 1961 agreements were

20  also revoked.  However, its rights were then, on the same page, re-granted to

21  SSI:  "The Trustees hereby assign, grant, and set over unto [SSI] all of the

22  rights in and to [the works] which were transferred to [him by virtue of the

23  1930 Grant, as amended.]"  SSI, in exchange for royalties, granted to Disney

24  radio, television, motion picture, and merchandising rights to the works.

25

26

27

    [5] In this document, Christopher Robin Milne, the author's only son, is not listed as a

28  Pooh Property Trustee.

**B.    The Termination Notices**

On November 4, 2002, Clare Milne served on SSI a notice of termination regarding the works.  The termination refers to the 1930 Grant (as amended and "reconfirmed"), and the 1961 Agreements.

On that same date, Harriet Jessie Minette Hunt, illustrator Shepard's granddaughter, served on SSI a notice of termination regarding the works as well.  Hunt's termination notice stated the intent to terminate

all grants from Ernest H. Shepard to A.A. Milne on, prior to or subsequent to January 6, 1930 with respect only to rights granted to Stephen Slesinger (or Stephen Slesinger, Inc.) the grant from A.A. Milne to Stephen Slesinger on January 6, 1930 as amended, and all prior and subsequent grants from Ernest H. Shepard (or any successor), extending, re-defining, confirming or re-granting the foregoing rights.

The effective date in the notice of termination is November 5, 2004.  In or around November 2002, in a document that has not been filed with the Court (but has been described in the parties' papers), Disney entered into agreements with Milne and Hunt assigning to Disney the rights that will revert to them in 2004 ("the Reversion Agreement").

**III. Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(c)**

Rule 12(c) of the Federal Rules of Civil Procedure permits a party to move to dismiss "[a]fter the pleadings are closed but within such time as not to delay the trial." Judgment on the pleadings may be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co., Ltd.,* 132 F.3d 526, 529 (9th Cir. 1997) (internal quotations and citations omitted).  In deciding a motion for judgment on the

6

1  pleadings pursuant to Rule 12(c), the Court may consider pleadings,
2  documents attached as exhibits or incorporated by reference in the
3  pleadings, and matters of which the Court may take judicial notice; the
4  Court may also consider documents not explicitly incorporated in or
5  attached to the complaint if the complaint necessarily relies on these
6  documents and their authenticity is not questioned. *See Parrino v. FHP, Inc.,*
7  146 F.3d 600, 709 (9th Cir. 1998), *cert. denied,* 525 U.S. 1001 (1998).

8

9  ## IV. The Changing Copyright Laws and the Works

10  When the works were copyrighted, the 1909 Copyright Act was in
11  effect.  The 1909 Act granted an author a period of twenty-eight years of
12  copyright protection, plus an additional twenty-eight years of protection if
13  the copyright was renewed.  17 U.S.C. § 24 (1909 Act) (repealed).  The parties
14  agree that the copyrights to the works were properly renewed.  The
15  copyrights in the works were therefore in subsistence on January 1, 1978, the
16  effective date of the 1976 Copyright Act.
17  The 1976 Copyright Act granted an additional 19 years of protection to
18  works that were in their renewal period at the effective date of the Act.  17
19  U.S.C. § 304(a).  This act extended the copyright protection period in the
20  works to the early 2000s.  The 1976 Act also created certain residual rights
21  for authors and their heirs as to rights to works that had previously been
22  granted to third parties.  17 U.S.C. § 304(c).  Authors or their heirs would be
23  permitted to terminate others' rights in works within a five-year period
24  beginning fifty-six years after the creation of the work.  17 U.S.C. § 304(c)(3).
25  It appears that in this case, the termination rights under the 1976 Act were
26
27
28

1    not ever exercised.[6]

2         In 1998, Congress passed the Sonny Bono Copyright Termination

3    Extension Act ("CTEA"), effective October 27, 1998.  The CTEA granted

4    additional residual rights to authors and heirs of protected works whose

5    termination rights under the 1976 Act had expired without being exercised.

6    17 U.S.C. § 304(d).  But these additional rights were conferred only with

7    respect to grants that were made before the effective date of the 1976 Act,

8    January 1, 1978.[7]  Termination under CTEA may be effected by an author or

9    his heirs within the five-year time period beginning seventy-five years after

10   the creation of the work. 17 U.S.C. § 304(d)(2).  Termination notices must be

11   served no fewer than two and no more than ten years prior to the effective

12   date of the termination.  17 U.S.C. § 304(c)(4)(A).

13

14                        **V. The Milne Termination Notice**

15        SSI's Motion for Judgment on the Pleadings implicates the issue at the

16   very heart of the present dispute:  Should the 1983 SSI Agreement be treated

17   as a pre-1978 agreement to be governed by the termination provisions of 17

18   U.S.C. § 304?

19        Nothing in the Copyright Acts has altered the power of private parties

20   to contract.  H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976), *reprinted in*

21   1976 U.S.C.C.A.N. 5659, 5743.  The Court acknowledges that the 1983 SSI

22   Agreement was created in order to protect SSI and Disney from a

23

24

25        [6] As evidenced by the 1983 SSI Agreement, Christopher Robin Milne chose to enter into

26   a new agreement regarding rights to the works rather than exercise his right of termination.

27        [7] Termination rights with respect to grants made by the author  on or after the effective

     date of the 1976 Act are governed by 17 U.S.C. § 203(a).  Under § 203(a), such a grant may not

28   be terminated for thirty-five years.

1  termination of the rights granted to them.[8]  The language of the 1983 SSI

2  Agreement expressly states that the parties "revoke" the 1930 Grant, as

3  amended, and the 1961 Agreements.  The 1983 SSI Agreement is a new, post-

4  1977 agreement.  Significantly, the parties describe their 1983 agreement as a

5  "new agreement for the future which the parties believe would not be subject

6  to any right of termination under 17 U.S.C. Secs. 203 or 304(c)."  (1983

7  Agreement, page 2)

8        Plaintiffs argue that the 1983 SSI Agreement is merely an extension of

9  the 1930 Grant.  Plaintiffs point to the interpretation of two provisions

10  regarding termination agreements as set forth in Nimmer on Copyrights,

11  § 11.07.[9]  In this section, Professor Nimmer explains the rationale behind

12  §§ 203(a)(5) and 304(c)(5)'s provision that "[t]ermination of the grant may be

13  effected notwithstanding any agreement to the contrary, including an

14  agreement to make a will or to make any future grant."

15        These provisions, Nimmer explains, are meant to protect an author

16  from a grantee with greater bargaining power who demands that an author

17  agree to surrender his or her future right of termination as a condition of

18  sale.  In such a situation, Nimmer hypothesizes that an original grantee may

19  be able periodically to extend the time before which termination may occur,

20  if the grantee can persuade the author to terminate the original grant by

21  contract, and negotiate a new one, "thereby causing another 35-year period to

22  start running."

23  _____

24        [8] Plaintiffs object to the admissibility of the legal opinion offered to Disney by Melville
     Nimmer regarding this issue. The Court does not rule on the admissibility of this document;
25  the fact that the 1983 SSI Agreement was meant to protect the continuing viability of the
     author's grant of rights to SSI is evident from the Agreement itself.
26

27        [9] The Court recognizes that Plaintiff's counsel, David Nimmer, is a co-author of this
     treatise. However, Plaintiffs have submitted evidence that §11.07 of the treatise has remained
28  substantively unchanged since 1978. (See 02/03/03 Nimmer Decl., Exh. 1).

Nimmer noted that there is a serious legal question whether the execution of a new grant will effectively postpone the period for termination if the voluntary termination of the prior grant is conditioned by the grantee upon the grantor's consent to execute the new grant. Nimmer predicted that courts could "conclude that a grantee may not subvert the statutory rule against obtaining a new grant prior to termination of the original grant . . . unless there is at least a moment when the grantor is bound under neither the prior nor the new grant." Nimmer saw this moment as something more than a mere formality: "During this moment, of course, the grantor could refuse to execute the new agreement. This would fulfill the statutory purpose of giving the grantor at least one chance to revoke the grant." Nimmer predicted that "[w]ithout such a period between the lapse of the prior grant and the commencement of the new one, there is not a new grant, but only a change in the terms of the old grant, which remains viable for the purpose of measuring the time until the termination period."

Here, it is evident that by combining the revocation of the 1930 Grant with the re-granting of the same rights in the same documents, the parties were careful not to provide Christopher Robin Milne and/or the Trustees with the opportunity to revoke the grant. Therefore, Plaintiffs argue that the Court should reject SSI's arguments and rule in accordance with Professor Nimmer's conclusion that such transfers are "agreements to the contrary" within the meaning of §§ 203(a)(5) and 304(c)(5).

Under other circumstances, the Court could be persuaded by this "moment of freedom" argument. Here, however, the Court is unpersuaded, for two reasons.

First, neither §304(c)(5) nor §203(a)(5), both of which provide that termination of a grant may be effected "notwithstanding any agreement to the contrary," apply to this case. Section 304 does not apply, because this is a

post-1978 agreement, and § 203 does not apply, because the grant in question was not made by the author.

Second, even if § 304 were deemed applicable, the author's son had the opportunity to terminate the 1930 Grant as to each of the four works prior to the execution of the 1983 agreement on April 1, 1983. Christopher Robin Milne could have terminated the 1930 Grant as to *When We Were Very Young* effective as early as November 20, 1980, and to *Winnie-the-Pooh* as early as October 21, 1982. The earliest that termination of the rights to the other two works, *Now We Are Six* and *The House at Pooh Corner,* could have been effected was October 14, 1983 and October 15, 1984, respectively. Although the termination dates as to the last two works would have occurred after the execution of the 1983 agreement, the termination notices (which must be filed two years before the termination effective date) could have been served before the execution of the 1983 agreement, Christopher Robin Milne, therefore, had his "moment of freedom" to revoke the rights granted to SSI under the 1930 Grant, but chose not to do so. Therefore, the concerns raised by Nimmer regarding conditioning a revocation of rights on a new grant of those rights is not implicated.

Plaintiffs also contend that the 1983 agreement was an ineffective attempt to alter the nature of the parties' relationship, citing *Marvel Characters, Inc. v. Simon,* 310 F.3d. 280 (2nd Cir. 2002). In *Marvel,* the parties had entered into a settlement agreement, many years after a work's creation, stipulating that the original work had been a "work for hire." The Court concluded that the parties could not alter the nature of their relationship by changing its designation, and held that the agreement was an "agreement to the contrary" under § 304(c)(5) of the 1976 Act. (*Id.* At 291)

This case is significantly distinguishable from *Marvel.* The parties in the 1983 Agreement did not attempt to change or modify the nature of their

1  association with one another, or alter the character of their long-standing
2  author/grantee relationship.
3      The 1983 Agreement was a new contract, effective after January 1,
4  1978,  Accordingly, the Milne termination notice is invalid.
5

6                    **VI. The Hunt Termination Notice**
7      Arguments raised by the parties have convinced the Court that a
8  separate discussion of the rights of Ernest H. Shepard ("the illustrator") is
9  warranted.  Markedly absent from the many agreements that have taken
10  place over the years regarding the works is the participation of Shepard or
11  his descendants.  Shepard's descendants are equally absent from this action.
12      It appears to the Court that Hunt is a person to be joined if feasible
13  under Fed. R. Civ. P. 19(a).  The Court is without sufficient information to
14  determine whether her joinder is feasible.
15

16                        **VII. SSI's Counterclaims**
17      In light of the Court's holding regarding the invalidity of the Milne
18  termination notice, SSI's counterclaims are moot, and are **hereby dismissed**
19  for that reason.
20

21                          **VIII. Conclusion**
22      Defendant's Motion for Judgment on the Pleadings or alternatively,
23  for Summary Judgment (docket #11), is **hereby granted in part and denied**
24  **in part**.  Plaintiff Disney's Motion to Dismiss Counterclaims or alternatively,
25  for a More Definite Statement (docket #37) is **denied**.  Plaintiff Milne's
26  Motion for Summary Judgment (#55) is **denied**.
27      Judgment on the pleadings is **hereby granted** in favor of SSI as to
28  Plaintiffs' declaratory relief claim regarding the validity of the Milne

Termination Notice.